**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

GOLDEN DREAM HIVE, LLC, *et al.*,

Plaintiffs,

v. 1:25-cv-931 (AMN/ML)

CHARLES CEFALU, *et al.*,

Defendants.

---

**APPEARANCES:** **OF COUNSEL:**

**THE LINDEN LAW GROUP, PC** **JEFFREY BENJAMIN**
250 Park Avenue, 7th Floor
New York, NY 10177
*Attorneys for Plaintiffs*

**RUPP PFALZGRAF LLC** **JAMES J. GRABER**
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
*Attorneys for Defendants*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

On July 16, 2025, plaintiffs Anna Kilian ("Kilian") and Kilian Acquisitions, LLC initiated this action against individual defendants Chales Cefalu ("Cefalu") and Jennifer Comstock ("Comstock"), and business entity defendants Ameristar Home Realty, LLC ("Ameristar"), REO Home Services, LLC ("REO"), and Hustle & Heart Homes, Inc. ("Hustle & Heart"). Plaintiffs' counsel subsequently filed a Second Amended Complaint ("Complaint"), which removed Kilian and Kilian Acquisitions, LLC as plaintiffs, and substituted in Golden Dream Hive, LLC ("Golden Dream Hive") and Cherry Blossom Alley, LLC ("Cherry Blossom Alley") (collectively,

"Plaintiffs"), now suing all of the original defendants in addition to business entity defendants Ameristar Financial Corporation ("Ameristar Financial") and Foreclosure Solutions Group, LLC ("Foreclosure Solutions") (collectively, "Defendants"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. § 1961 *et seq.*, ("RICO"), in addition to various state law claims.

On November 6, 2025, Defendants filed a partial motion to dismiss the complaint pursuant to Rule 12(b)(6) (the "Motion"). Dkt. No. 27. Plaintiffs opposed the Motion on November 26, 2025, *see* Dkt. No. 30, and Defendants filed a reply in further support on December 3, 2025, *see* Dkt. No. 31. Accordingly, Defendants' Motion is ripe for adjudication.

For the reasons set forth below, the Court grants the Motion and dismisses the case.

## II. BACKGROUND

Unless otherwise noted, the following facts are drawn from the Complaint, its attachments, or materials it incorporates by reference, and are assumed to be true for purposes of ruling on the motion, *see Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam), or are otherwise matters of public record. *Williams v. N.Y.C. Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020).

### A. The Complaint

This case concerns two real estate investments projects between Kilian, co-investors Anna Witowska ("Witowska") and Jiyeon Kim ("Kim"), and Defendants. Plaintiffs allege that the two projects were part of a racketeering scheme by Defendants, i.e., real estate salesperson Cefalu, project manager Comstock, and several business entities they own or control.

In August of 2023, Kilian met Comstock via a group chat on WREIN, an online mentorship forum for women interested in investing in real estate "regardless of their background or experience level." Dkt. No. 23 at ¶¶ 16-17, 21. Comstock offered Kilian and several co-investors,

including Witowska and Kim, an opportunity to invest in upstate New York properties. Dkt. No. 23 at ¶¶ 21-22. Comstock said she was working with a licensed realtor, Cefalu, who had purchased several properties after they went into foreclosure. Dkt. No. 23 at ¶ 24. Through a series of online messages, telephone calls, and a Zoom presentation given by Cefalu on October 12, 2023, he and Comstock offered Kilian, Witowska, and Kim a "one stop shop" "Fix and Flip" deal—they would finance Plaintiffs' purchase of Cefalu's foreclosed properties, manage the renovations and repairs, and then assist in re-selling them at a profit. Dkt. No. 23 at ¶¶ 23, 27. Though Kilian, Witowska, and Kim all lived more than four hours away from the sites, Cefalu told them it was his normal practice to sell properties to buyers "on a sight-unseen basis." Dkt. No. 23 at ¶¶ 33-34. Cefalu and Comstock were aware Kilian and the other investors lacked real estate experience, and so offered to "spoon feed" them through the process. Dkt. No. 23 at ¶ 28.

Plaintiffs allege that Cefalu and Comstock effectuated this proposal through several business entities they owned or controlled. Cefalu is "a member and/or principal shareholder" of defendant REO Home Services, which owned the properties at issue in this case and later sold them to Plaintiffs. Dkt. No. 23 at ¶¶ 11-12, 39, 83. Defendant Ameristar, in which both Cefalu and Comstock were either members or employees, fully financed the purchases of both properties and their subsequent renovations. Dkt. No. 23 at ¶¶ 8-10, 41, 83. And Comstock's company Hustle & Heart was supposed to carry the projects from cradle to grave, with a broad set of contractual responsibilities including inspecting the properties, managing renovation and development work, hiring and overseeing contractors, maintaining financial records, and then either performing or assisting in the properties leasing or sale. Dkt. No. 23 at ¶¶ 15, 46, 86. In

exchange, Comstock charged 20% of the rehabilitation costs as a fee for her project management services.[1] Dkt. No. 23 at ¶ 32.

Kilian decided to pursue two of the projects offered by Cefalu and Comstock. She entered into an evenly-split partnership with Witowska to purchase, rehabilitate, and sell a single-family home in Sidney, New York (the "Sidney property"), through the then-newly formed business entity—and now-plaintiff—Golden Dream Hive. *See* Dkt. No. 23 at ¶¶ 37-39. Separately, Kilian partnered with Kim in now-plaintiff Cherry Blossom Alley to fix and flip a property in Troy, New York (the "Troy property"). *See* Dkt. No. 23 at ¶¶ 79, 81-82

Plaintiffs allege that both projects were plagued by Defendants' mismanagement and repeated misrepresentations. Starting with the Sidney property, in February of 2024 Comstock visited it and reported that a $25,000 budget would be sufficient for renovations. Dkt. No. 23 at ¶¶ 39, 42. Golden Dream Hive purchased the Sidney property for $85,000, and Cefalu told Plaintiffs they could expect a profit of $30,000 on a post-renovation sale. See Dkt. No. 23 at ¶¶ 37, 41. But in April, Comstock told Kilian that a contractor had discovered that electrical re-wiring was necessary—contrary to Cefalu's prior representation that only cosmetic work would be required, *see* Dkt. No. 23 at ¶ 37—forestalling any other renovations. Dkt. No. 23 at ¶ 50. And

---

[1] Two other business entity defendants, Ameristar Financial and Foreclosure Solutions, are identified as defendants in the caption of the Complaint. *See* Dkt. No. 23 at 1. But both are mentioned only once in the Complaint itself, in a conclusory allegation that they were members of the alleged RICO association-in-fact. *See* Dkt. No. 23 at ¶ 119. No statements of fact support their involvement in this case. *See generally* Dkt. No. 23. When Defendants pointed out this discrepancy, Plaintiffs replied that the Complaint "is rife with allegations, among other things, as to [Ameristar Financial's] withholding of funds at critical points in time." Dkt. No. 30 at 26 n.4. But while there *are* factual statements about withheld funds in the Complaint, these are all imputed to Ameristar, a distinct business entity and defendant from Ameristar Financial. *See* Dkt. No. 23 at ¶¶ 8-10, 62, 65, 77, 83, 110, 119. Whether this suggests Plaintiffs confused Ameristar and Ameristar Financial, or failed to differentiate between the two when referring to an 'Ameristar,' is immaterial—the Court is bound not to "invent factual allegations that [Plaintiffs have] not pled." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

by the end of May, despite the completion of some of the required electrical work, Kilian learned the house still needed further electrical re-wiring and plumbing repair. Dkt. No. 23 at ¶¶ 52, 54. On November 10, 2024, Kilian visited the property in person and discovered that not only had the electrical work still not been properly completed, but that Comstock had failed to review it prior to paying the electrician in full. Dkt. No. 23 at ¶ 72. To that point, Comstock had also allegedly violated other contractual obligations by, among other things, failing to update an online web application tracking the project, Dkt. No. 23 at ¶ 48, failing to consistently visit the Sidney property, Dkt. No. 23 at ¶ 57, and failing to maintain accurate records regarding payments to contractors and the use of Kilian's credit card to purchase materials, *see* Dkt. No. 23 at ¶¶ 59, 63, 67, 73, 77. Further, Cefalu and Comstock had failed to properly pay out both the original financing earmarked for the renovation and an additional loan Ameristar extended to cover the unexpectedly high cost of work on the Sidney property—and, ultimately, Kilian and Witowska had to self-fund the remainder of the work. *See* Dkt. No. 23 at ¶¶ 62-63, 65-67, 69. In total, renovation work cost "well above" the $25,000 originally projected for the project, and the Sidney property was only ready for sale in December of 2024. Dkt. No. 23 at ¶¶ 75, 78. Kilian also learned that Defendants had failed to report the Sidney property was in a flood zone, and as such flood insurance would not be available. Dkt. No. 23 at ¶ 73.

Plaintiffs allege a similar pattern of mismanagement and misrepresentation with respect to the Troy property. Cherry Blossom Alley purchased the Troy property on April 1, 2024, for $110,000, and at that time Cefalu assessed that $40,000 would be sufficient to cover refurbishment, with an expected profit of $60,000. *See* Dkt. No. 23 at ¶ 82. But, as with the Sidney property, Comstock failed to either monitor the contractor's work or account for expenditures—and by early October of 2024, a roof repair required before any other renovations could begin was still

incomplete, and Comstock had abandoned her position as project manager. Dkt. No. 23 at ¶¶ 96-99, 107, 109. Further, unlike the Sidney property, the Troy property faced an issue with occupants. While the purchase contract had stated that the property was occupied, Cefalu had reported it would not be a problem to remove the occupants. Dkt. No. 23 at ¶ 83. But Cefalu did not disclose that the occupants were squatters, *see* Dkt. No. 23 at ¶ 112, and from May through late September of 2024 there were repeated break-ins at the Troy property, *see* Dkt. No. 23 at ¶¶ 89, 92, 97, 102, 105-06, 108. Comstock promised to install lights and decoy cameras outside the house to discourage the break-ins, but not only did she never do so, *see* Dkt. No. 23 at ¶ 97, Kilian later learned that the back gate of the Troy property had been left unlocked for months, Dkt. No. 23 at ¶ 108. The break-ins caused a buyer of the Troy property to withdraw their interest. Dkt. No. 23 at ¶ 105. Kilian later learned from consultations with local contractors and investors that the Troy property required more than $100,000 of repair work, and it would not sell for more than $90,000 without those renovations. Dkt. No. 23 at ¶ 109.

Defendants sold the Troy property on February 6, 2025, resulting in a loss to Plaintiffs of more than $53,000. Dkt. No. 23 at ¶ 114. As of October of 2025, Defendants were attempting to sell the Sidney property without Plaintiffs' approval, and Plaintiffs anticipated a loss on the property in excess of $89,000. *See* Dkt. No. 23 at ¶ 115. Further, Plaintiffs allege that "Defendants have engaged in substantially similar behavior with other members of the WREIN Community related to properties in Saratoga and nearby New York counties," identifying in particular "two other victims" and the addresses of their properties. Dkt. No. 23 at ¶ 117.

**B. Procedural History**

This action was initiated by a complaint on July 16, 2025, which identified the plaintiffs as Kilian and Kilian Acquisitions, LLC, and the defendants as Cefalu, Comstock, Ameristar, REO Home Services, and Hustle & Heart. *See* Dkt. No. 1. In the complaint, the plaintiffs contended

that the Court had diversity subject matter jurisdiction. *See* Dkt. No. 1 at ¶ 2; *see* 28 U.S.C. § 1332. Kilian and Kilian Acquisitions, LLC filed a First Amended Complaint on August 6, 2025 with minimal changes. *See* Dkt. No. 6. The defendants identified in those first two complaints filed a motion to dismiss, principally contending that Golden Dream Hive and Cherry Blossom Alley were not named plaintiffs, that the complaint failed to adequately plead Kilian and Kilian Acquisitions, LLC were parties to the relevant contracts, and that accordingly the case should be dismissed for lack of standing. Dkt. No. 13-6 at 5-10; *see Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) ("A non-party to a contract governed by New York law lacks standing to enforce the agreement in the absence of terms that clearly evidence[] an intent to permit enforcement by the third party in question.") (internal quotation omitted).

In response, on October 24, 2025, Plaintiffs' counsel filed the instant Complaint, "primarily to correct the named plaintiffs, among the other issues in the motion." Dkt. No. 20; *see* Dkt. No. 23. The Complaint removes Kilian and Kilian Acquisitions, LLC, as plaintiffs, and substitutes in Golden Dream Hive and Cherry Blossom Alley. *See* Dkt. No. 23. It also adds Ameristar Financial and Foreclosure Solutions as defendants. *See* Dkt. No. 23. And, in addition to these other changes, it repleads this case as arising from the Court's federal question jurisdiction because of Plaintiffs' RICO claim, contending the Court has supplemental jurisdiction over various state law claims. Dkt. No. 23 at ¶ 2; *see* 28 U.S.C. §§ 1331, 1367(a).

On November 26, 2025, Defendants filed a partial motion to dismiss the Complaint. *See* Dkt. No. 27. In their motion, Defendants contend that Plaintiffs have not stated a RICO claim because they fail to plead distinctness as required for a substantive RICO claim and because they fail to plead a pattern of racketeering activity. *See* Dkt. No. 27-2 at 5-11. Defendants also contend that Plaintiffs fail to adequately plead relevant factual allegations against defendants Ameristar

Financial and Foreclosure Solutions, *see supra* note 1, and against defendant REO Home Services. *See* Dkt. No. 27-2 at 11-13. Finally, Defendants contend that the Court should dismiss one of Plaintiffs' claims under state law for failure to state a claim for breach of fiduciary duty against defendants Cefalu and Comstock. *See* Dkt. No. 27-12 at 13-15.

## III. STANDARD OF REVIEW

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of a party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering legal sufficiency, a court must accept as true all well-pled facts in the complaint and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). This presumption, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleadings, the court may consider documents that are "integral" to the pleadings even if they are neither physically attached to, nor incorporated by reference into, the pleadings. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (alteration in original) (internal quotation marks omitted). Under this standard, a pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## IV. DISCUSSION

### A. RICO

Plaintiffs assert a substantive civil RICO claim against Defendants pursuant to Section 1962(c) of RICO. *See* Dkt. No. 23 at ¶¶ 118-127. "Section 1964 establishes a private right of action for individuals who are harmed by racketeering activity," which "permits a plaintiff to bring a RICO claim for sustaining injuries in his business or property by reason of a violation of [S]ection 1962." *Israel v. City of Syracuse*, No. 21-cv-915, 2021 WL 4777256, at *4 (N.D.N.Y. Sept. 16, 2021) (citing 18 U.S.C. § 1964), *report and recommendation adopted*, 2021 WL 4773232 (N.D.N.Y. Oct. 13, 2021). To state a RICO claim under Section 1962(c), a plaintiff must allege that "(1) the defendant has violated the substantive RICO statute, and (2) the plaintiff was injured in his business or property by reason of a violation of [S]ection 1962." *Id.* (internal quotation marks and citation omitted). Specifically, a plaintiff must allege four elements: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). This showing must be made as to each individual defendant. *See United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of [S]ection 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise.").

**1. Distinctness of the RICO Enterprise**

Defendants' first challenge is to the distinctness of the alleged RICO enterprise. RICO liability under Section 1962(c) attaches to "any person employed by or associated with any enterprise engaged in . . . the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). A "person" includes "any individual or entity capable of holding a legal or beneficial interest in property," 18 U.S.C. § 1961(3), and an enterprise is any "ongoing organization, formal or informal," in which "the various associates function as a continuing unit," *United States v. Turkette*, 452 U.S. 576, 583 (1981). Because the statute requires both, a plaintiff must allege the existence of both a "person" (or "person[s]"), within the meaning of the statute, and an "enterprise" that is "not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *see Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("[T]he person and the enterprise referred to must be distinct . . . . [because] the plain language of [S]ection 1962 clearly envisions separate entities."). "It thus follows that a corporate person cannot violate the statute by corrupting itself." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013). Moreover, a RICO enterprise cannot consist "merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant," *Id.* at 122 (quoting *Riverwoods Chappaqua Corp.*, 30 F.3d at 344), even if those agents are incorporated as distinct and separate legal entities, because then RICO liability could "attach to any act of corporate wrong-doing and the statute's distinctness requirement [would] be rendered meaningless," *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 206 (2d Cir. 2017) (quoting *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013)).

Defendants contend that Plaintiffs fail to plead distinctness because the Complaint "describe[s] a single business operation owned and controlled by the same two individuals acting

through commonly owned entities, rather than a distinct enterprise." Dkt. No. 31 at 5. On this account, by pleading that "Cefalu and Comstock own, manage, or control" REO Home Services, Ameristar, and Hustle & Heart, "and that all perform real estate related functions for the same businesses," Dkt. No. 27-2 at 7-8, the RICO enterprise here "amounts to nothing more than the corporate defendants and their owners functioning within the same business operation, not a distinct association-in-fact enterprise." Dkt. No. 27-2 at 8. But, as an initial matter, while a "corporate entity may not be simultaneously the 'enterprise' and the 'person' who conducts the affairs of the enterprise," *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 89 (2d Cir. 1999) (quotation omitted), where a complaint instead alleges the corporation itself is the RICO "enterprise," and its owners and employees the RICO "persons" conducting the affairs of the corporation through a pattern of racketeering activities, it *can* satisfy the distinctness requirement. *See United States v. Kelly*, 128 F.4th 387, 412 (2d Cir. 2025) ("[T]he RICO provision . . . applies when a corporate employee unlawfully conducts the affairs of the corporation of which he is the . . . owner.") (quoting *Cedric Kushner Promotions, Ltd.*, 533 U.S. at 166); *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 536 (S.D.N.Y. 2014). So a corporation can be a RICO enterprise distinct from its president and owner, *see Cedric Kushner Promotions, Ltd.*, 533 U.S. at 160, as can a sole proprietorship from its individual defendant owner, *see City of New York v. Smokes–Spirits.com, Inc.*, 541 F.3d 425, 448-49 (2d Cir.2008), *rev'd and remanded on other grounds sub nom. Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010), as can a corporation from the combination of other individuals and corporations that own it, *see 4 K & D Corp.*, 2 F. Supp. 3d at 536. Further, the distinctness requirement "does not foreclose the possibility of a corporate entity being held liable as a defendant under [S]ection 1962(c) where it associates with

others to form an enterprise that is sufficiently distinct from itself." *Riverwoods Chappaqua Corp.*, 30 F.3d at 344.

That is precisely the case here, because the Plaintiffs do not plead that any particular legal entity was the enterprise, but rather that the individual defendants and their various business entities collectively operated as an association in fact. *See* Dkt. No. 23 at ¶ 119. A RICO enterprise can be "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(5). "The term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (internal citation omitted). So any informal association in fact may qualify as a RICO Enterprise if the members "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 820 F.Supp. 89, 98 (S.D.N.Y.1993)). This can include business entities and a shared owner, because even if that owner had complete ownership those businesses would still "be separately existing legal entities capable of constituting an association-in-fact enterprise." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263 (2d Cir. 1995). Here, Plaintiffs allege that two individual defendants owned and operated three businesses, and made fraudulent representations about the quality and profitability of several fix-and-flip investments to draw Plaintiffs into business. Each business "was an independent entity that could benefit from" the individual defendants' fraudulent representations—one owned and sold the properties to Plaintiffs, the second financed the sale and renovations, and the third managed the project of fixing and flipping the properties, *see* Dkt. No. 23 at ¶¶ 8-12, 39, 41, 43, 46, 83, 86. *Securitron Magnalock Corp.*, 65 F.3d at 263 ("In short, these corporations were active, operating businesses rather than [three] stacks of stationery."); *U1it4less,*

*Inc.*, 871 F.3d at 206 (looking for whether business entities with shared ownership "operate independently in different lines of business, receive independent benefits from the illegal acts of the enterprise, and affirmatively use their separate corporate status to further the illegal goals of the enterprise"). As such, the Complaint sufficiently pleads distinctness between the RICO persons and their alleged association-in-fact enterprise.

**2. Pattern of Racketeering Activity**

Defendants find far more purchase with their second challenge to the Complaint. The third and fourth elements of a substantive RICO claim require a plaintiff to sufficiently allege a "pattern of racketeering activity," including at least two acts of "racketeering activity" that occur within ten years of each other, 18 U.S.C. § 1961(5), and which "amount to, or pose a threat of, continuing criminal activity." *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997). Predicate "racketeering activity" specifically refers only to acts "indictable under various specified federal statutes" listed in Section 1961(1) of the RICO statute. *1567 56th St., LLC v. Spitzer*, 774 F. Supp. 3d 476, 492 (E.D.N.Y. 2025). The only two such acts mentioned in the Complaint, mail fraud and wire fraud, are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (citing, *inter alia*, Fed. R. Civ. P. 9(b)). Thus, the elements of mail fraud and wire fraud—"(i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires," *see Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (citations omitted)—must be pled with particularity. *See Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 125 (S.D.N.Y. 2023). A scheme to defraud requires the defendant to make a material misrepresentation. *Edmondson v. Raniere*, 751 F. Supp. 3d 136, 168 (E.D.N.Y. 2024) (citing *Williams*, 889 F.3d at 124). And a misrepresentation is only material if it is "likely

to be deemed significant to a reasonable person considering whether to enter into the transaction —that is, if it misstates the economic value of the bargain." *Id.* (internal quotation marks and citation omitted).

Plaintiffs have failed to adequately plead the predicate acts required for a RICO claim under Rule 9(b). While the Complaint states generally that "the vast majority of communications" between Kilian, Witwoska, Kim, and the Defendants "were by phone, email or messenger," Dkt. No. 23 at ¶ 23, only once does the Complaint specifically identify the date, speaker, method of communication, and potentially material misrepresentations made in a statement by a Defendant—an October 12, 2023 Zoom call where Cefalu spoke to WREIN members including Kilian, Dkt. No. 23 at ¶¶ 27-30. *See Campos v. Lavinsky*, No. 22-cv-1278, 2022 WL 16950054, at *3 (E.D.N.Y. Nov. 14, 2022) (finding that a plaintiff must "specify the statements he claims were false or misleading, give particulars as to the respect in which the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements" (alterations omitted)); *United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020) (noting that a plaintiff must plead fraudulent intent as to each defendant "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) ("RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.") (internal quotation omitted).[2] But even assuming that this statement sufficed to plead an instance of wire

[2] Surveying some of the other alleged statements by Defendants demonstrates Plaintiffs' failure to plead the predicate racketeering acts with the specificity required by Rule 9(b). *See, e.g.*, Dkt. No. 23 at ¶ 21 (noting a group chat occurred "[i]n or about August of 2023," but not specifying any

fraud, a "pattern of racketeering activity" under RICO requires at least two acts. *See* 18 U.S.C. § 1961(5); *Albunio v. Int'l Safety Grp., Inc.*, No. 15-CV-152, 2016 WL 1267795, at *6 (S.D.N.Y. Mar. 30, 2016) ("[I]t is beyond cavil that a single incident of racketeering activity does not constitute a 'pattern' for RICO purposes."). This alone defeats the substantive RICO claim.

But even if Plaintiffs had identified more than one predicate instance of racketeering activity, they have not made sufficient factual allegations to plead that Defendants' conduct "amount[s] to, or pose[s] a threat of, continuing criminal activity." *Schlaifer*, 119 F.3d at 97. A plaintiff can meet this continuity requirement by showing either a "close-ended" pattern constituting "a series of related predicate acts extending over a substantial period of time," or an "open-ended" pattern "pos[ing] a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool*, 520 F.3d at 183 (citations omitted). Closed-ended continuity is "primarily a temporal concept," and the Second Circuit has "never held a period of less than two years" to be a substantial period of time. *Id.* at 184 (quoting *Cofacredit, S.A. v.*

---

person in that group chat other than Comstock, and not pleading any facts supporting an inference that Comstock's statements that she had previously "successfully completed a 'Fix and Flip' transaction" with Cefalu or that "WREIN members could increase their savings or retirement funds by investing" were false and made with fraudulent intent); Dkt. No. 23 at ¶ 37 (alleging that Cefalu "represented that the [Sidney] property would only require quick cosmetic work and that it would be ready for sale within 4 months," but not identifying a medium of communication, when that representation was made, or facts suggesting fraudulent intent); Dkt. No. 23 at ¶ 73 (alleging that when confronted with information the Sidney property was in a flood zone, "Cefalu told Kilian it did not matter and, falsely, that most of the town was in the flood zone," but not identifying when the statement was made or through which medium of communication); Dkt. No. 23 at ¶ 75 (stating "Cefalu . . . made [a] false and inaccurate representation[] that the [Sidney] property would sell for $175,000.00" without identifying when, to whom, through which medium, or facts suggesting this evaluation was made with fraudulent intent); Dkt. No. 23 at ¶¶ 83, 89, 91, 112 (stating that at the time of the sale, despite the occupants being squatters, "Cefalu represented to Kilian and Kim that occupancy of the [Troy property] would not be an issue for the rehabilitation and that it would not be a problem causing the occupants to leave," but not identifying when, through which medium, or fraudulent intent—and later pleading facts suggesting that Defendants only learned about the squatters after the sale).

*Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)). For open-ended continuity, while the threat is assumed where "the enterprise's business is primarily or inherently unlawful," if, as here, "the enterprise primarily conducts a legitimate business," a plaintiff must allege "that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id.* at 185 (quoting *Cofacredit, S.A.*, 187 F.3d at 243); *see Bayshore Cap. Advisors, LLC*, 667 F. Supp. 3d at 136 ("[I]t is well established law that fraud does not fall within the 'inherently unlawful' category of predicate acts so as to imply a threat of continued criminal activity.") (citations omitted). "In assessing whether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and of the predicate acts are relevant." *DeFalco*, 244 F.3d at 323. But where a scheme is "inherently terminable," there is no implied threat of continued racketeering activity. *Cofacredit, S.A.*, 187 F.3d at 244 (quoting *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995)).

In the Complaint, Plaintiffs make a conclusory allegation that this is a case of open-ended continuity. Dkt. No. 23 at ¶ 120. But Plaintiffs' entire argument for continuity boils down to a single sentence in their opposition to the Motion: "The fact that Defendants insinuated themselves into the WREIN group, evidently looking for victims to exploit, and, as alleged in the SAC, found not only the Plaintiffs but at least two other unsuspecting victims, belies Defendants' argument that this was a limited, and single purported scheme." Dkt. No. 30 at 25. The two other unsuspecting victims are presumably the two individuals named in the one paragraph "Other Victims" section of the Complaint. *See* Dkt. No. 23 at ¶ 117. However, the sum total of the allegations regarding those individuals is that "Defendants have engaged in substantially similar behavior with other members of the WREIN Community related to properties in Saratoga and nearby New York counties," and that these "two other victims of Defendants' pattern of practice

of their fix and flip scheme" are "willing to and will be subpoenaed to testify as to their damages in this matter." Dkt. No. 23 at ¶ 117. Bare allegations that Defendants engaged in "substantially similar behavior" with two other named individuals are insufficient to support open-ended continuity. "[O]pen-ended continuity must be evaluated based only on the predicate acts adequately pled in the complaint." *Paul Hobbs Imports Inc. v. Verity Wines LLC*, No. 21 CIV. 10597 (JPC), 2023 WL 374120, at *11 (S.D.N.Y. Jan. 24, 2023). Here, Plaintiffs do not allege any particular statements made to the two other individuals purportedly subject to Defendants' alleged scheme, identify how those statements were fraudulent, or give any details about how, when, where, or who made them. *See Campos v. Lavinsky*, 2022 WL 16950054, at *3.

As such, what Plaintiffs allege is a "discrete and relatively short-lived scheme to defraud a handful of victims," which does not suffice to show open-ended continuity. *Cofacredit, S.A.*, 187 F.3d at 244 (citing *GICC Capital Corp.*, 67 F.3d at 468–69.); *see Bayshore Cap. Advisors, LLC*, 667 F. Supp. 3d at 137 ("The handful of wire fraud predicates Plaintiffs have alleged is insufficient to allege that the predicate acts of wire fraud were 'the regular way' that Defendants operated their business."). Plaintiffs' contention that Defendants inserted themselves into the WREIN group to find victims, and therefore might do so again, is a "speculative claim[] regarding how long the fraud would continue," unsupported by well-pleaded allegations, that "do[es] not, on [its] own, support a showing of open-ended continuity." *Grace Int'l Assembly of God v. Festa*, 797 F. App'x 603, 606 (2d Cir. 2019); *see MinedMap, Inc. v. Northway Mining, LLC*, No. 21-1480-CV, 2022 WL 570082, at *2 (2d Cir. Feb. 25, 2022) (finding "largely conclusory" allegations "do not allege with the requisite particularity how the fraud scheme would continue into the future"). As

Plaintiffs fail to plead the required pattern of racketeering activity, the Court grants Defendants' Motion regarding Plaintiffs' Section 1962(c) substantive RICO claim.[3, 4]

**B. Jurisdiction Over Remaining State Law Claims**

Though the Court dismisses Plaintiffs' RICO claim, which is the sole basis for federal jurisdiction in this case,[5] it has the authority to hear the state law claims under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). In considering whether to maintain supplemental jurisdiction, the Court exercises its discretion to determine whether to adjudicate such claims. That

---

[3] Even if Plaintiffs had stated a RICO claim as to the scheme writ large, they would lack statutory standing as to the Sidney property because those RICO injuries are not ripe. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006) ("RICO standing is a more rigorous matter than standing under Article III.") (citation omitted). "A RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation[,] and only when his or her actual loss becomes clear and definite." *Id.* (internal quotation omitted). *D'Addario v. D'Addario*, 901 F.3d 80, 94 (2d Cir. 2018). And in the civil RICO setting a "fraud defendant is not liable for all losses that *may occur,* but only for those *actually suffered*." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 136 (2d Cir. 2003); *see D'Addario*, 901 F.3d at 94. As pled, the Complaint does not allege clear and definite losses that have already occurred as to the Sidney property. While the Troy property was finally sold in February of 2025, resulting losses to Plaintiffs in excess of $53,000, the Sidney property had not yet been sold at the time Plaintiffs filed the Complaint. *See* Dkt. No. 23 at ¶¶ 114-15. Plaintiffs themselves plead that "the exact amount of the loss that Plaintiffs will suffer from that sale is unknown," though they "estimate" their loss on the property will be "in excess of $89,756" when Defendants sell the property "without Plaintiffs' authorization." Dkt. No. 23 at ¶ 115. But the Second Circuit instructs this Court that a RICO plaintiff may not, "through predictions of a defendant's future plans, artificially ripen a claim that is unripe under our jurisprudence." *D'Addario*, 901 F.3d at 94.

[4] Because the Court concludes that Plaintiffs have failed to plead a pattern of racketeering activity, it does not reach any of Defendants' other arguments for dismissal. *See supra* note 1.

[5] The Court may not exercise diversity jurisdiction because, among other things, the Plaintiffs do not allege each of the members of any of the Plaintiff or Defendant limited liability corporations. Dkt. No. 23 at ¶¶ 4-15; *see Bayerische Landesbank, N. Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012) ("[A] limited liability company . . . takes the citizenship of each of its members."); *250 Lake Ave. Assocs., LLC v. Erie Ins. Co.*, 281 F. Supp. 3d 335, 341 (W.D.N.Y. 2017) ("Since Plaintiff is an LLC, the proper inquiry for determining the existence of complete diversity is whether Defendant is diverse from all of Plaintiff's members 'because an LLC has the citizenship of each of its members for diversity jurisdiction.'") (quoting *Alvarez & Marshal Glob. Forensic & Dispute Servs., LLC*, 14-CV-0290, 2014 WL 641440, at *2 (S.D.N.Y. Feb. 19, 2014)).

discretion is guided by the Supreme Court's instruction that "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted); *see First Capital Asset Mgmt., Inc.*, 385 F.3d at 183 ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.") (citation omitted). However, before declining to exercise supplemental jurisdiction, "the Court must also consider whether values of judicial economy, convenience, fairness, and comity would be disserved by such a decision." *Principia Partners LLC v. Swap Fin. Grp., LLC*, No. 18-cv-7998, 2019 WL 4688711, at *5 (S.D.N.Y. Sept. 26, 2019); *see also Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004). The Court concludes that they will not be disserved here. This case is in its early stages and discovery has not yet begun, so any concerns about judicial economy, convenience, and fairness are limited. *See 24 Seven, LLC v. Martinez*, No. 19-cv-7320, 2021 WL 276654, at *10 (S.D.N.Y. Jan. 26, 2021). Moreover, "[a]llowing Plaintiff[s] to pursue [their] state law claims in state court would 'avoid needless decisions of state law by this Court, which also promotes the interests of comity and justice.'" *Principia Partners*, 2019 WL 4688711, at *6 (quoting *Moran v. Tryax Realty Mgmt, Inc.*, No. 15-cv-8570, 2016 WL 3023326, at *4 (S.D.N.Y. May 23, 2016)). Therefore, the balance of factors counsels in favor of declining to exercise

supplemental jurisdiction, and accordingly the Court dismisses the remaining state law claims without prejudice.

**CONCLUSION**

Accordingly, the Court hereby

**ORDERS** that Defendants' Motion to dismiss, Dkt. No. 27, is **GRANTED**; and the Court further

**ORDERS,** that the Clerk shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the Parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 15, 2026
Albany, New York

Anne M. Nardacci
U.S. District Judge